**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AIM GROUP, LLC D/B/A REVE BODY
SCULPTING, and AMY LOUISE STONE,                   CASE NO.:1:26-cv-12129-AK


      Plaintiffs,

vs.

BTL INDUSTRIES, INC.,
and MEGHAN AUSTIN,

      Defendants.

_____/

## AMENDED COMPLAINT

Plaintiffs, AIM GROUP, LLC D/B/A REVE BODY SCULPTING and AMY LOUISE

STONE, by and through undersigned counsel, sues Defendants, BTL INDUSTRIES, INC., and

MEGHAN AUSTIN, and alleges as follows:[1]

### NATURE OF THE ACTION

1.     This is a civil action for unfair and deceptive business practices, antitrust violations,

fraud, and negligent misrepresentation.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1332. The amount in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs. Jurisdiction over the state and common law claims is also

---

[1] Plaintiff Aim Group, LLC d/b/a Reve Body Sculpting is hereby referred to as "Reve Body Sculpting." Plaintiff Amy Louise Stone is hereby referred to as "Ms. Stone." Reve Body Sculpting and Ms. Stone are hereby collectively referred to as "Plaintiffs." Defendant BTL Industries, Inc. is hereby referred to as "BTL." Defendant Meghan Austin is "Ms. Austin." BTL and Ms. Austin are hereby collectively referred to as "Defendants."

appropriate under 28 U.S.C. § 1367(a) and principles of pendent jurisdiction.

3.    This Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(a). A substantial part of the events or omissions giving rise to the claims in this action occurred in this District and/or Defendants may be found in this District. Further, the agreements between Plaintiffs and BTL that are the subject of this action require the jurisdiction of all disputes "arising out of, or relating to, this Agreement to a court in Boston, Massachusetts."

## THE PARTIES

4.    Reve Body Sculpting is a limited liability company registered in the Commonwealth of Kentucky, with a principal place of business at 12238 Shelbyville Rd., Louisville, KY 40243, with members who are citizens of the Commonwealth of Kentucky.

5.    Ms. Stone is a Kentucky citizen doing business in Louisville, Kentucky.

6.    BTL is a corporation of the Commonwealth of Massachusetts, with a principal place of business at 362 Elm Street, Marlborough, MA 01752.

7.    Ms. Austin is a citizen of Nashville, Tennessee.

## FACTUAL ALLEGATIONS

8.    BTL is a privately owned developer and manufacturer of Emsculpt®, Emsculpt NEO® and Cellutone body-contouring and/or skin-tightening products.

9.    BTL's Emsculpt® utilizes its proprietary high intensity focused electromagnetic energy (HIFEM®), which introduced an entirely new category of muscle toning and muscle strengthening to the aesthetic industry. BTL's Emsculpt NEO® combines BTL's HIFEM® and radiofrequency technology to tone muscle and break down fat.

10.    BTL's Cellutone is a non-invasive cosmetic treatment designed to reduce the

2

appearance of cellulite and improve skin texture and firmness by utilizing the energy of strong, targeted mechanical vibrations that improves oxygen supply and microcirculation to the skin.

11.    BTL engages in the sale of equipment such as Emsculpt NEO® and Cellutone, class II medical devices that may only be sold to medical professionals. Defendants heavily solicited Ms. Stone, a non-medical professional, as a potential purchaser of the equipment as Ms. Stone has a weight loss center in Louisville, Kentucky, Reve Body Sculpting.

12.    BTL intentionally targets and solicits business owners that are unsophisticated in the industry of body contouring and skin tightening so that they are unfamiliar with the market and what price the treatment sessions for their product bring in the market, and they have no way of confirming.

13.    BTL sells these business owners extremely expensive equipment promising great returns and a booming market knowing that in reality there is no market for services using BTL's equipment at BTL's required minimum advertised prices.

14.    BTL teams up with MMP Capital and QL Titling Trust to provide these business owners with boilerplate Equipment Finance Agreements implying that these business owners may only finance the equipment with MMP Capital or QL Titling Trust and making these business owners believe that the finance agreements were mandatory and not subject to negotiation. BTL then misrepresents the interest rates for the financing and allows BTL to lie to these business owners that their personal credit would not be affected by the equipment financing and no personal assets would be subject to the collection if a default occurred on the financing. These lies are made to further induce the business owners to purchase the BTL equipment and enter Equipment Finance Agreement. MMP Capital then immediately sells the debt to third parties without the knowledge of the business owners.

15.	On or about August 12, 2022, BTL's Meghan Austin approached Plaintiffs about purchasing BTL equipment.

16.	During the August 12, 2022 meeting at Plaintiffs' office, Defendants advised Plaintiffs that Plaintiffs would be purchasing a used Emsculpt NEO® demo, and, as a result, Plaintiffs would be purchasing the equipment at a discounted price and would be receiving the Cellutone for "free."

17.	Plaintiffs ultimately discovered that these representations were false when she went to a BTL conference on or about December 9, 2023, and spoke to another provider who advised Ms. Stone that BTL offered to sell the provider both the Emsculpt NEO® and Emsella® for a price that was about $20,000.00 less than what she paid for a supposedly used demo of the Emsculpt NEO® and the Cellutone for "free."

18.	During this meeting, Defendants also advised Plaintiffs that they have not and will not sell or attempt to BTL equipment to any other providers within an approximate 20-mile radius of Plaintiffs' office. Yet, Plaintiffs later discovered that Defendants attempted to sell BTL equipment to a competitor, Blue Halo, which is within walking distance from Plaintiffs' office, after Defendants sold the equipment to Plaintiffs.

19.	Also to induce Plaintiffs' purchase, Defendants knowingly and intentionally misled and lied to Plaintiffs about the profitability and existence of a market to sell services with BTL's products at BTL's minimum advertised prices, including the following misrepresentations made to Plaintiffs on or about August 12, 2022 at Plaintiffs' office:

    a.	Emsculpt® is selling so well and making customers good money;

    b.	Emsculpt NEO® is the holy grail and, like death and taxes, Emsculpt NEO® is a certainty in life;

4

c. Providers payoff the Emsculpt® and/or Emsculpt NEO® within a year or less because the equipment brings in so many customers that it essentially pays for itselfs;

d. Emsculpt® and/or Emsculpt NEO® is the number one requested service in all aesthetic and wellness right now. It is the number one purchase piece of equipment right now in all of aesthetics. It is a very hot brand because patients are asking for it. So, from that direct-to-consumer level, people are hearing and reading and seeing about Emsculpt NEO®;

e. Emsculpt® and/or Emsculpt NEO® brings in 51% more new patients to practices;

f. If providers wait to purchase the equipment and provide services using BTL's equipment, those providers could be missing out on $50,000 to $60,000 per month in sales;

g. Providers servicing customers with BTL equipment near Ms. Stone are making good money;

h. Plaintiffswill make 2.5 times the investment on one system before needing to replace the applicators and the BTL equipment will make Plaintiffs so much money that the cost of the applicators will be like "chump change";

i. The price of each piece of equipment will go up starting January 2023 by at least $50,000;

j. BTL is doing $30 million in marketing;

k. BTL will provide Plaintiffs with a billboard to market Plaintiffs' BTL equipment;

l. Ms. Austin is personally invested in Plaintiffs' success and will make it her personal mission to help with Plaintiffs' marketing to ensure that Plaintiffs are profitable;

m. BTL will provide a bus tour that will bring Plaintiffs loads of customers.

20.     Defendants provided Plaintiffs with boilerplate Equipment Finance Agreements that MMP Capital quickly assigns to third parties, such as Dext Capital. BTL also provided Plaintiffs with QL Titling Trust's boilerplate Equipment Finance Agreement. Defendants further made representations to Plaintiffs implying that Defendants were connected to MMP Capital and that the financing would come from BTL. Defendants advised Plaintiffs of the interest rate and the terms of the loan on behalf of MMP Capital and QL Titling Trust. Further, these boilerplate Equipment Finance Agreements do not disclose or state an interest rate. Defendants advised Plaintiffs that they could return the equipment if servicing BTL products does not work out with no penalty, that a default would not appear on personal credit, and that Ms. Stone was not pledging any future assets. Yet, unbeknownst to Plaintiffs, the Equipment Finance Agreements contain a personal guarantee and do not allow for the return of the equipment. These false statements were made purely to induce Plaintiffs to enter into the Equipment Financing Agreements with MMP and QL Titling Trust by giving Plaintiffs a false sense of security that there was no downside to making the investment to purchase the equipment.

21.     On August 12, 2022, as a result of fraudulent misrepresentations by Defendants in the sale of the equipment, Plaintiffs contracted with BTL to purchase the Emsculpt NEO® and Cellutone. A copy of the Emsculpt NEO® and Cellutone Purchase Contract is attached hereto as Exhibit "A." At the same time, Plaintiffs executed Equipment Finance Agreements in connection with this equipment as it was understood by Plaintiffs that they could not purchase the BTL equipment without executing Equipment Finance Agreements with MMP Capital and QL Titling Trust.

22.     The total purchase price of all BTL equipment purchased by Plaintiffs is

approximately $234,374.60.

23.   Once BTL sells someone equipment, they then assign a business development person to contact the purchaser who is really instructed by BTL to try and sell the purchaser additional BTL equipment rather than actually trying to help the provider get business.

24.   In addition to the cost of the equipment, Plaintiffs further invested approximately $200,000.00 in staffing, training, marketing, and business development to operate the new body sculpting business as sold to them by BTL's fraudulent misrepresentations.

25.   The Emsculpt NEO® and Cellutone agreements included a Retail Price Maintenance ("RPM") price restraint agreement with a minimum advertised price ("MAP") consumer pricing schedule. The RPM consumer retail price was $850.00 per Emsculpt NEO® treatment/session.

26.   The provider automatically becomes a party to the RPM agreement when it purchases the Emsculpt NEO® and other non-invasive body sculpting equipment from BTL. The BTL   purchase   agreement   includes   the   following   hidden   RPM   language:

**Minimum Advertised Pricing Policy.** If Customer participates in Emsculpt NEO® MAP (minimum advertised pricing of $850/ treatment) and Emsculpt MAP (minimum advertised pricing of $750/ treatment), BTL will offer the following benefits:

(1) include Customer in BTL's provider directory,
(2) 2nd and 3rd year warranty service coverage at no charge (annual value of $15,000) on the Emsculpt or Emsculpt NEO device (excluding consumable and replacement parts), and
(3) discount from list price for replacement applicators (Emsculpt applicators discounted from $30,000 to $10,000; Emsculpt NEO applicators discounted from $30,000 to $15,000).

BTL will provide Customer with a written notice for the first non-compliance with MAP, and a second infraction will result in loss of benefits. Examples of non-compliance to MAP policy include representing over the phone, promoting, or publishing:

· Treatments at a price below the MAP
· "Buy one, get one" offers
· Package offers averaging out to less than MAP
· Statements such as or similar to "we will beat any price" or "guaranteed lowest pricing anywhere"
· Participating in social coupons and discount sites

Any modification to the MAP policy must be in writing by BTL. BTL sales employees or independent contractors do not have the authority to modify or grant exceptions to this policy. BTL reserves the right to adjust the MAP at its sole discretion at any time. BTL may also designate promotional periods during which the policy terms change.

*See* Ex. A.

27.    BTL body sculpting equipment purchases (RPM and non-RPM governed equipment) may routinely exceed $500,000, often exceeding $1 million, including financing costs.

28.    The provider uses the equipment to provide body sculpting services to consumers. The RPM agreement governs the minimum retail price of the services the provider may advertise to consumers. In the case of the Emsculpt NEO®, the provider may not advertise below $850 per treatment session (with a BTL recommended 4-treatment minimum of $3,400). BTL maintains similar RPM agreements for other equipment it sells to providers.

29.    To operate the equipment, the provider must regularly purchase expensive consumables from BTL, a potential indirect royalty. If a provider violates the RPM agreement, BTL doubles the cost of the applicators needed to run the machine from $15,000 to $30,000 and removes the provider from the BTL online Provider List, making profitability with the equipment highly unlikely. The previously stated coercions and other coercive penalties were invoked against Plaintiffs when Plaintiffs chose to advertise the treatment sessions for less than the required MAP forced upon them by BTL in 2023 because they were not able to get business at the required MAP. In addition, the consumable terms mislead BTL equipment buyers that providers may exit the RPM agreement and maintain the profitability of their investment.

30.    Providers seeking to sell BTL Emsculpt NEO® equipment and exit their investment must pay BTL an approximate $100,000 arbitrary recertification/transfer fee. The BTL agreement mentions the fee, but the amount is not specified, which is a material omission. The transfer fee makes reselling and exiting the equipment investment virtually impossible and misinforms the buyer regarding BTL assurance to police its market.

31.    As a result of the hidden RPM contractual provision, BTL maintains a perpetual

security interest in the equipment to ensure the provider's performance of its obligations as BTL requires the recertification fee, will prevent the machine from working, doubles the cost of the applicators, and removes the provider from the BTL website. The security interest makes reselling and exiting the investment in the equipment virtually impossible, and it misinforms the buyer regarding BTL assurance to police its market.

32.    BTL includes coercive punishments for RPM violators and providers seeking to exit the RPM agreement that damages the provider's investment in RPM-governed and non-RPM-governed equipment investments.

33.    BTL requires a separate purchase agreement for each unique piece of equipment it sells to a provider.

34.    BTL used misleading and deceptive business investment language and equipment income presentations to induce the initial purchase of BTL equipment and subsequent equipment purchases by Plaintiffs at BTL provider conferences where BTL upsells the business investment opportunity of using BTL equipment, thereby targeting Plaintiffs and providers to purchase additional (expensive) BTL equipment.

35.    BTL induced Plaintiffs by guaranteeing Plaintiffs that they would be making at least $50,000 a month and further pressuring Plaintiffs by stating that they would be losing out on this revenue if they did not begin investing in BTL right away. The earnings representations made by BTL were significant to Plaintiffs and fraudulently induced them into purchasing the equipment.

36.    BTL provided false and misleading information to Plaintiffs to make them believe that there was a market for the services provided by their machines when, in fact, BTL knew that no such market exists and that virtually none of their retailers were able to sell the services for the

minimum-RPM of $850 per session or even $200 per session for that matter. Further, BTL significantly inflated the price of the machines based upon this false market that it created.

37.     Under information and belief, BTL has made similar misrepresentations to other purchasers to induce them to buy their equipment, and those other purchasers are unable to sell the services for the MAP required by BTL or even for much less.

38.     Price Discrimination. The BTL RPM is a vertical price-fixing system that favors body sculpting businesses with preexisting customer flows (before becoming a BTL provider), allowing such companies to sell the RPM-governed services below the MAP. At the same time, new market entrant BTL providers cannot advertise below $850 per session with the required 4-session minimum of $3,400. The BTL price restraint creates price discrimination with demonstrable cost of operations differentials between BTL providers, delivering favored providers, i.e., providers with preexisting customer flows, lower customer acquisition costs, and improved operations margins, freeing them to spend more on advertising and marketing and offer other high- valued and more diverse service offerings. These advantages increase the profitability of favored BTL providers over non-favored BTL providers and effectively reduce competition among BTL vertical providers and horizontal competition as discriminated providers leave the market.

39.     Consumables. Instead of ceasing business with an RPM-violating provider, BTL increases the equipment consumable cost by 100%, thereby punishing the provider by directly increasing the provider's cost basis of operating the equipment. Increasing a provider's consumable costs is a coercive act designed to enforce the BTL price restraint provision; however, the price restraint renders the targeted provider unprofitable and destroys the provider's significant investment in BTL equipment, which may exceed $1 million. Many vertical BTL providers use

competitor equipment to provide health and beauty services, including body sculpting, and compete horizontally with BTL providers and non-BTL providers. Unprofitable BTL providers leaving the market result in a less competitive horizontal market and shrinking consumer choice.

40.    Transfer Fee. Providers seeking to exit the RPM by selling their equipment must pay BTL a $100,000 recertification/transfer fee. The BTL agreement mentions the fee, but the amount is not specified, a material omission. The transfer fee is a coercive attempt to enforce the RPM by rendering the selling and exiting of the RPM-governed investment virtually impossible, causing the provider to suffer continued losses or incur a catastrophic loss. In addition, the transfer fee informs buyers that BTL will police its market to ensure RPM compliance and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. However, BTL does not enforce this provision and has permitted a secondary equipment market to emerge. In addition, though BTL does not enforce the recertification/transfer fee, the recertification/transfer fee deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering continued and ongoing losses.

41.    Coercive Non-Price Restraints. BTL uses the aforementioned non-price restraints to punish RPM-offending providers and non-offending providers seeking to exit the RPM agreement. In addition, BTL extends its non-price coercion to non-RPM-governed equipment. In the event of an RPM violation or a provider exiting the RPM agreement, BTL coercively removes the provider entirely from BTL's national Provider List verification system, notwithstanding that the provider may own or have invested in non-RPM-governed BTL body sculpting equipment. The Provider List is an online service operated by BTL that allows consumers to validate a provider's ownership of BTL equipment (RPM and non-RPM-governed equipment) and select a BTL provider to provide the consumer's desired body sculpting services. BTL removes or delists

a provider from the validation system for an RPM violation or simply exiting the RPM agreement, thereby rendering the provider invisible to consumers, notwithstanding the provider having invested in excess of $1 million in BTL RPM and non-RPM governed equipment. Delisting shuts the provider out of the body sculpting market and destroys its investment in RPM-governed and non-RPM governed equipment, reducing vertical and horizontal competition and consumer choice.

42.     BTL's Perpetual Security Interest. To ensure buyer compliance with all provisions of the agreement and RPM, the buyer grants BTL a perpetual security interest in the equipment to secure the "performance by the Customer of its liabilities and obligations." The perpetual security interest presents and informs buyers that BTL will police its market to ensure RPM compliance, impose recertification/transfer fees, and stop the emergence of a secondary equipment market that may undercut RPM-governed providers. BTL does not enforce this provision, as evidenced by the emergence of a secondary market for BTL equipment whereby buyers may purchase BTL equipment at astronomical discounts; for example, 75% - 90% off the original equipment price is common in the secondary BTL equipment market. By not enforcing its security interest in the equipment and policing its market, BTL allows two distribution models to exist, whereby vertically price-restrained RPM providers to compete horizontally with secondary market non-price-restrained BTL equipment owners, where the cost basis and operational expense are a fraction of the RPM-governed providers. Such horizontal competition with identical but non-price-restrained BTL equipment owners reduces or destroys the profitability of price-restrained BTL providers, resulting in providers leaving the market, diminished horizontal competition and consumer choice, and increased consumer prices within the body sculpting market and related services. In addition, though BTL does not enforce the security interest, the security interest deters providers from selling their BTL equipment and exiting their investment, which results in providers suffering

12

continued and ongoing losses.

43.    <u>Restricted Marketplace.</u> BTL coercions and RPM vertical price restraint result in providers losing the freedom to reject the RPM without suffering massive economic loss. The BTL RPM provision (i) precludes providers from freely acquiring other competitive goods to the price-fixed goods, (ii) precludes providers from selling off their equipment/inventory, (iii) generates a manufacturer (BTL) driven cartel where providers have no freedom to select another manufacturer or alternative consumable devices and services to deliver to consumers, (iv) misinforms the provider regarding expected revenue and equipment profitability, causing devastating harm to the provider and its ability to serve the market, and (v) advantages select providers through price and non-price restraints. Providers with existing body sculpting customer flows may sell RPM-governed services at a low, market-realistic price. In contrast, providers without existing body sculpting customers may only advertise for customers at the BTL governed $850/$3,400 minimum package price for which there is little to no market. BTL is aware that their RPM regime results in a majority of their providers losing money on their BTL investment, with many going out of business and leaving the market.

44.    <u>Fraud.</u> BTL integrated a minimum price RPM into its sales process to purposefully and fraudulently induce potential customers (providers) into purchasing BTL Emsculpt NEO® equipment at inflated and unrealistic prices. Under information and belief, BTL knew there was little to no market for the services provided by the equipment; consequently, the vast majority of BTL providers lost their investment in RPM-governed equipment. The BTL sales process utilizes the stated RPM minimum advertised price ($850 per session/$3,400 4-session minimum) to (1) make an indirect earnings claim that misleads buyers regarding the business prospects of their BTL investment, (2) indicate and misinform buyers that a sufficiently large market exists for the

Emsculpt NEO® equipment at the RPM-governed service price, and (3) indicate and misinform buyers that RPM service price is a luxury sale notwithstanding BTL flooding the market with its RPM-governed equipment without accompanying RPM pricing adjustments to account for the increased number of in- market providers all competing for the same customer base.

45.     BTL Conferences. After purchasing a BTL device, BTL invites the provider to attend BTL-sponsored conferences where BTL sells additional (costly) equipment to the provider. At these conferences, BTL removes all pretense regarding promoting its business opportunity. "Build Your Aesthetic Empire" conference headliners and BTL featured speakers, that are typically doctors paid by BTL, promoting the revenue opportunities available with further investment in BTL equipment was customary.

46.     BTL Actively Screened Objective Questioning. BTL prevented providers, including Plaintiffs, from attending BTL conferences with potentially damaging questions about the BTL business sales process and the actual market size for RPM-governed services.

47.     BTL knowingly utilized its RPM vertical price restraint to obtain an unlawful objective, promote investment in costly body sculpting equipment and business:

     a.   as a disguised earnings claim to rationalize the purchase of overpriced equipment;

     b.   to mislead and misinform providers regarding the economic prospects for revenue and profitability of the proposed investment;

     c.   to falsely establish a market for the service of the equipment;

     d.   to inflate the market price for the service of the equipment;

     e.   to unlawfully coerce buyers to uphold the RPM;

     f.   to harmfully intervene in buyers' ability to perform due diligence; and

     g.   to promote the sale of an unregistered business opportunity.

48.    BTL knowingly set the RPM outside the known universe for its RPM- governed service for which no demonstrable market exists in the U.S., which resulted in catastrophic economic harm to Plaintiffs and other BTL equipment owners.

49.    Defendants were aware that the RPM regime would not provide sufficient profitability to providers such that the provider may offer additional desirable services, including services that compete with BTL equipment services.

50.    Defendants were aware that provider profitability was negatively impacted by their flooding the market with RPM-governed equipment.

51.    BTL attempted to secure adherence to its RPM by means that go beyond mere declination to sell to providers.

52.    BTL used price and non-price restraints to unlawfully coerce providers from exiting the RPM agreement, causing tremendous economic damage to providers.

53.    BTL used an undisclosed $100,000 recertification/transfer fee to unlawfully coerce acquiescence to the RPM agreement and otherwise coerce providers from selling off their investment in RPM-governed equipment, causing tremendous economic damage to providers.

54.    BTL used the RPM to unlawfully coerce providers to maintain participation in a money-losing BTL investment and service.

55.    BTL used the RPM to prevent providers from effectively communicating any price below the mandated minimum price to potential customers through both restraints on advertising and restraints on direct communication with customers.

56.    BTL knowingly included material omissions in its RPM agreement designed to mislead providers.

57.    BTL knowingly sold the same RPM-governed equipment to preexisting body

sculpting businesses with large customer flows and to non-body sculpting businesses. As configured, the minimum advertised RPM delivered considerable market advantages to select providers while harming other providers.

58.    BTL knowingly generated an anticompetitive regime that inflates consumer service pricing and harms consumer availability amongst other vertical and horizontal competition.

59.    BTL knowingly generated an alternative, horizontal competitive distribution model unknown to providers that harmed RPM-governed providers and reduced market competition.

60.    Defendants knowingly sold the equipment at a highly inflated price and rationalized the inflated price to potential buyers by fraudulently representing to the buyers that the MAP represented the market price that the equipment would bring to the buyer per session.

61.    Defendants' actions, unfair and deceptive statements, and misrepresentations are false, misleading, defamatory, unfair and deceptive and were calculated to deceive, and as a result, they have caused Plaintiffs to sustain serious injury and damages to its business reputation and operations.

## COUNT I – VIOLATION OF KRS 367.170
### (Against Defendants)

62.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-61 as incorporated herein.

63.    At all relevant times, Defendants were engaged in trade or commerce within the meaning of KRS 367.110(2).

64.    Defendants' actions described above, including but not limited to Defendants' misrepresentations of material fact listed within paragraph 16-19, constitute unfair or deceptive acts or practices in the conduct of trade or commerce within the meaning of and in violation of KRS 367.170

65.     Further, Defendants sold BTL equipment to Plaintiffs knowing that Plaintiffs were non-medical professionals, in violation of statutory and regulatory requirements, despite Plaintiffs advising Defendants that they did not have a medical director or any medical professional to operate the equipment

66.     Under information and belief, Defendants' actions described above have at all times relevant to this action been willful and/or knowing.

67.     As a direct and proximate result of Defendants' actions alleged above, Plaintiffs have suffered monetary damages.

<u>**COUNT II – FRAUD**</u>
**(Against Defendants)**

68.     Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-61 as incorporated herein.

69.     On or about August 12, 2022, Defendants made the following misrepresentations of material facts to Plaintiffs:

a. Plaintiffs would be purchasing a used Emsculpt NEO® demo, and, as a result, Plaintiffs would be purchasing the equipment at a discounted price and would be receiving the Cellutone for "free."

b. Emsculpt® is selling so well and making customers good money;

c. Providers payoff the Emsculpt® and/or Emsculpt NEO® within a year or less because the equipment brings in so many customers that it essentially pays for itself;

d. Emsculpt® and/or Emsculpt NEO® brings in 51% more new patients to practices;

e. Providers servicing customers with BTL equipment near Plaintiffs are making good money.

f. BTL is doing $30 million in marketing.

g. Plaintiffs will make 2.5 times the investment on one system before needing to replace the applicators and the BTL equipment will make Plaintiffs so much money that the cost of the applicators will be like "chump change";

h. Defendants have not and will not sell or attempt to sell BTL equipment to anyone within an approximate 20-mile radius;

i. Ms. Austin is personally invested in Plaintiffs' success and will make it her personal mission to help with Plaintiffs' marketing to ensure that Plaintiffs are profitable;

j. BTL will provide Plaintiffs with a billboard to market their BTL equipment;

k. BTL will provide a bus tour that will bring Breiner loads of customers.

70. At the time Defendants made these representations to Plaintiffs, Defendants knew or should have known these representations were false.

71. Defendants made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase the BTL equipment.

72. Defendants failed to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak in order to induce the Plaintiffs to act to their detriment.

73. Plaintiffs justifiably relied upon these misrepresentations.

74. As a direct result, Plaintiffs have been injured.

### COUNT III – NEGLIGENT MISREPRESENTATION
(Against Defendants)

75. Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-61 as incorporated herein.

76. On or about August 12, 2022, Defendants made several misrepresentations of

material facts to Plaintiffs regarding the f BTL equipment.

77.    At the time Defendants made these representations to Plaintiffs, Defendants should have known these representations were false.

78.    Defendants made these representations to Plaintiffs with the intent to induce Plaintiffs to rely on the representations and to induce Plaintiffs to purchase the BTL equipment.

79.    Plaintiffs justifiably relied upon these misrepresentations.

80.    As a direct result, Plaintiffs have been injured.

<u>**COUNT IV – DECLARATORY RELIEF**</u>
**(Against BTL)**

81.    Plaintiffs repeat and reallege each and every allegation set forth above in paragraphs 1-61 as incorporated herein.

82.    Plaintiffs herein request a declaratory judgment from the Court that the Emsculpt NEO® and Cellutone Purchase Contract is invalid and unenforceable as it was illegal for BTL to sell the BTL equipment to Plaintiffs.

83.    At all times material, BTL knew that neither Ms. Stone nor anyone at Reve Body Sculpting were physicians or licensed practitioners.

84.    The BTL equipment are class II medical devices that may only be sold to medical professionals. This is further admitted by BTL on its website, which states that "BTL devices should only be used under the continued supervision of a physician or licensed practitioner." *See* BTL's website at hhtps://bodbybybtl.com.

85.    There is a bona fide dispute between Plaintiffs and BTL which creates an actual and present need for declaration from the Court.

86.    Pursuant to KRS 418.040, Plaintiffs petition the Court to issue a declaratory judgment as to the present and ascertainable issue of whether the Emsculpt NEO® and Cellutone

Purchase Contract is invalid and unenforceable

87.    Plaintiffs have an actual, present, adverse, and antagonistic interest in the subject matter.

88.    The relief sought is not just requesting the giving of legal advice or the answer to questions propounded out of curiosity.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter judgment in their favor on each and every claim for relief set forth above and award relief, including but not limited to the following:

   a.   Compensatory damages;

   b.   Consequential damages;

   c.   Treble damages;

   d.   Attorney fees;

   e.   Pre and post-judgment interest; and

   f.   Any other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable by right.

Dated June 11, 2026

/s/ *Ariane Wolinsky, Esq.*
**ARIANE WOLINSKY, ESQ.**
**FBN: 51719**
MANSFIELD BRONSTEIN & STONE, LLP
200 E. Broward Boulevard, Suite 1250
Ft. Lauderdale, Florida 33301
Phone: (954) 601-5600
Service Email Designation:
litigation@mblawpa.com

20

Marian A. Kornilowicz (BBO# 277680)
COHEN, SEGLIAS PALLAS,
GREENHALL & FURMAN, P.C.
1600 Market St., 32nd Floor
Philadelphia, PA 19103
Tel.: 215-564-1700
Fax: 512-564-3066
mak@cohenseglias.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via the Court's electronic filing notification system upon all parties registered to receive electronic notice in this case on this 11th day of June 2026.

/s/ *Ariane Wolinsky, Esq.*
**ARIANE WOLINSKY, ESQ.**
**FBN: 51719**



# BTL Industries, Inc.

**QUOTATION**

362 Elm St
Marlborough, MA 01752
Phone (866) 285-1656   Fax (888) 499-2502
www.btlaesthetics.com   info@btlnet.com

| | |
|---|---|
| **Office:** | Reve Body Sculpting |
| **Street:** | 12238 Shelbyville Rd |
| **City, State, Zip:** | Louisville, KY 40243 |
| **Phone:** | 270-366-6201 |
| **Key MD:** | Amy Stone |
| **Key Operator:** | |

**Physican's Email:** amyloum10@gmail.com
**Operator's Email:**

| Date | BTL Representative | Terms of Delivery |
|---|---|---|
| August 12, 2022 | Meghan Austin | FCA Marlborough, MA |

| Qty | Product # | Description | Unit Price | Total |
|---|---|---|---|---|
| 1 | A899.001/130 | EMsculpt NEO® with Small RF+HIFEM applicators<br>System includes: Emsculpt NEO® one set of large and one set of small applicators, power cord.<br>The applicators are free from defects for a period of 9,000 minutes of treatment.<br>All other parts of the device are covered for the remainder of the original warranty, one year.<br>Large and Small applicator replacement cost is $15,000 if you are in compliance with MAP.<br>This should be approximately for 300 patient treatments with each set of applicators. | $319,000.00 | $319,000.00 |
| 1 | A744.022 | CELLUTONE® System<br><br>system includes: CELLUTONE® applicator, 3 x additional transmitters | $89,000.00 | $89,000.00 |
| | | Discount: | $194,000.00 | ($194,000.00) |

**This tax is an estimate and the customer is responsible for any difference upon invoice.***

**Payment Terms:**

☐ Include Freight in Tax

By signing below, the Customer is entering into a binding agreement for the purchase of the equipment and/or services described and accepts the Terms and Conditions of Sale attached to this Quotation and any Additional Terms written below. Federal law restricts the equipment to sale by or on the order of a licensed practitioner.

| | |
|---|---|
| Subtotal | $214,000.00 |
| Shipping | $1,885.00 |
| SubTotal | $215,885.00 |
| Sales tax rate | 8.640% |
| Sales rate* | $18,489.60 |
| Total | $234,374.60 |

**Additional Terms**

VIP Approved Discount: Cleveland Clinical Training Unit+ Cellutone Device; 2 Testimonial Vidoes, 3 Before and After Photos, 2 Referral Phone Calls. Rebate check for Emsculpt NEO TV spots: 5k

DocuSigned by:
*Amy Stone*

Signature (Authorized Representative): Amy Stone

Print Name, Title:

Date: 8/15/2022

**Credit Card Authorization (max 10% from transaction value):**

| | |
|---|---|
| Credit Card Type: | [ ] Master Card   [ ] Visa   [ ] AMEX |
| Credit Card Number: | |
| Expiration Date: | CV2 # |
| Name as it appears on card: | |

**BTL Industries, Inc. ("BTL") Terms and Conditions of Sale** BTL provides its quotation and offer for sale of the Equipment listed above under the following terms and conditions only.

**Payment Terms.**Customer must pay a non-refundable deposit or the entire balance for all Equipment Customer must pay a non-refundable deposit or the entire balance for all Equipment and services including all taxes, fees and similar charges imposed by any governmental authority, before BTL will ship the Equipment or render the services. Interest will be charged at the rate of 18% per year, but not more than the highest rate permitted by applicable law, on accounts more than 30 days past due. All sales are final.

**Security Interest.** BTL reserves and the Customer grants to BTL a security interest in all Equipment sold and all proceeds to secure the full payment and performance by the Customer of its liabilities and obligations to BTL.

**Customer Representations.** Customer represents and agrees that Customer will use the Equipment in accordance with the Operator's Manual and with applicable federal, state, and local laws and regulations.

**Warranty.** BTL warrants to Customer only that the Equipment will be free from defects in material and workmanship which BTL determines in the exercise of its reasonable judgment impairs the ordinary use of the Equipment. The Warranty is limited to

> (1) one year from the date of shipment by BTL,
> (2) under normal use and service,
> (3) operated in a manner consistent with the specifications set forth in the Operator's Manual,
> (4) Equipment serviced by authorized BTL personnel only, and
> (5) Equipment using BTL-approved components.

This Warranty shall be void if any of these conditions are not met; if the Equipment has been subject to abuse, misuse, neglect, or accident; if the Equipment has been improperly stored, handled, or maintained; or if persons other than authorized BTL service personnel attempt or actually dismantle, disassemble, alter, or modify the Equipment. Customer's only remedy is that BTL will repair or replace a nonconforming part and supply the labor required to correct any defect, so long as the defect is reported to BTL during the warranty period. This Warranty is non-transferable. Consumable or disposable parts or accessories of the Equipment that are purchased at a future date will be sold with their own warranties and are not included in this Warranty. No amendment to this Warranty is effective unless it is in writing and signed by BTL.

**Warranty Disclaimer.** THE ABOVE IS BTL'S ONLY WARRANTY OBLIGATION, AND THE REMEDY PROVIDED ABOVE IS IN LIEU OF ANY AND ALL OTHER REMEDIES. THERE ARE NO OTHER AGREEMENTS, GUARANTEES, OR WARRANTIES, ORAL, WRITTEN, EXPRESSED, IMPLIED, OR STATUTORY, INCLUDING, WITHOUT LIMITATION TO, WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. BTL SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES DUE TO ANY CAUSE WHATSOEVER.

**Restrictions on Resale.** Customer agrees not to sell the Equipment to a third party unless such third party has been trained and certified by BTL to use the Equipment and Customer has provided the third party's name and contact information to BTL.

**Trademarks. BTL Marks shall mean any registered or unregistered trademarks or trade names** in the USA owned by BTL or its affiliates, or licensed to BTL. The Customer is granted a nonexclusive, non-transferable, limited license to use the BTL Marks that identify the specific Equipment and related services, for the express purpose of identifying and advertising the Equipment and related Services that Customer offers. Customer agrees to add such BTL Marks to its website within 30 days from delivery of the Equipment. Customer agrees not to obtain, register, or use any trademarks, internet domain(s), or business entity name(s) consisting of or incorporating the BTL Marks. Customer acknowledges its use of BTL Marks inures solely to BTL's benefit. Customer shall not debrand, rebrand, or private label any BTL Equipment or Service. This limited license to use the BTL Marks is subject to compliance with the terms of this Agreement.

DocuSign Envelope ID: 58B904FD-098C-46AF-95F8-1EF06293CC3D   Case 1:26-cv-12129-AK   Document 84   Filed 06/11/26   Page 24 of 24

Exhibit "A"

**Marketing Services.** If Customer purchases a marketing services package as part of this Agreement, then BTL and Customer will make reasonable efforts to cooperate in the provision of those services. BTL makes no representations or warranties with respect to any third-party marketing services including, but not limited to, any warranty of merchantability and warranty of fitness for a particular purpose.

**No Liability for Marketing Services.** IN NO EVENT WILL BTL BE LIABLE TO CUSTOMER FOR ANY DAMAGES ARISING OUT OF CUSTOMER'S USE OF ANY MARKETING SERVICES, INCLUDING THE PROVISION OF THIRD-PARTY MARKETING SERVICES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF USE, REVENUE OR PROFIT, BUSINESS INTERRUPTION, AND LOSS OF INFORMATION).

**Data Collection.** BTL reserves the right to periodically collect Equipment usage data for the purpose of running diagnostics and improving usability and performance. Data collected will not contain any patient identification information.

**Applicator Lifetime.** The Emsculpt and Emsculpt NEO® applicator lifetime is set to 9,000 minutes.

**Minimum Advertised Pricing Policy.** If Customer participates in Emsculpt NEO® MAP (minimum advertised pricing of $850/ treatment) and Emsculpt MAP (minimum advertised pricing of $750/ treatment), BTL will offer the following benefits:

(1) include Customer in BTL's provider directory,
(2) 2nd and 3rd year warranty service coverage at no charge (annual value of $15,000) on the Emsculpt or Emsculpt NEO device (excluding consumable and replacement parts), and
(3) discount from list price for replacement applicators (Emsculpt applicators discounted from $30,000 to $10,000; Emsculpt NEO applicators discounted from $30,000 to $15,000).

BTL will provide Customer with a written notice for the first non-compliance with MAP, and a second infraction will result in loss of benefits. Examples of non-compliance to MAP policy include representing over the phone, promoting, or publishing:

- Treatments at a price below the MAP
- "Buy one, get one" offers
- Package offers averaging out to less than MAP
- Statements such as or similar to "we will beat any price" or "guaranteed lowest pricing anywhere"
- Participating in social coupons and discount sites

Any modification to the MAP policy must be in writing by BTL. BTL sales employees or independent contractors do not have the authority to modify or grant exceptions to this policy. BTL reserves the right to adjust the MAP at its sole discretion at any time. BTL may also designate promotional periods during which the policy terms change.

**Governing Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. The Customer agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts.

**Entire Agreement.** Customer agrees to purchase according to these terms and conditions. No other terms and conditions apply unless BTL and Customer expressly agree in writing.

| | |
|---|---|
| **Signature (authorized Representative)** | DocuSigned by: *Amy Stone* |
| **Print Name** | Amy Stone |
| **Date:** | 8/15/2022 |